

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED - SHREVEPORT

MAR 2 9 2007

ROBERT H. SHEMWELL CLERK
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF LOUISIANA

# SHREVEPORT DIVISION

---

KATHLEEN MARIE ELLIOTT, ET AL.

versus

LARRY C. DEEN, ET AL.

CIVIL ACTION NO. 04-2580

JUDGE TOM STAGG

---

## MEMORANDUM RULING

Before the court is a motion for summary judgment filed by the defendants, Bossier Parish Sheriff Larry C. Deen ("Sheriff Deen"), Warden Kenneth Weaver ("Warden Weaver"), Bossier Parish Sheriff's Deputy Mark Toloso ("Deputy Toloso") and St. Paul Fire and Marine Insurance Company (hereinafter collectively referred to as "the defendants"). See Record Document 34. For the reasons stated below, the defendants' motion for summary judgment is **GRANTED.**

## I. BACKGROUND

On October 8, 2004, Barry Ray Elliott ("Elliott") was arrested by the Bossier Parish Sheriff's Department for attempting to obtain a controlled dangerous substance by fraud and transported to the Bossier Parish Jail. While being processed

into the jail, Elliott informed jail personnel that he was currently prescribed methadone for his dependency on pain medication and for physical pain. He further informed them that he was subject to extreme and dangerous physical withdrawals if he did not receive the proper amount of his medication.

On October 11, 2004, while still at the Bossier Parish Jail, Elliott completed a Medical Attention Request, wherein he stated that he was experiencing withdrawal effects from the lack of methadone--shaking, hallucinations, diarrhea, and vomiting. On October 12, 2004, Elliott was placed in isolation and given an extra blanket.

Also on October 12, 2004, Dr. Gary Mazzanti ("Dr. Mazzanti"), the medical director for the correctional facilities in Bossier Parish, prescribed methadone for Elliott as part of a step-down drug withdrawal program. The prescription called for 300 mg of methadone for two days, followed by 150 mg for two days, then 100 mg for three days.

On October 13, 2004, Elliott began the seven day methadone treatment designed to taper his dependence on methadone. On October 16, 2004, he was transferred to the Bossier Parish Penal Farm where he completed a medical screening form and again informed the correctional officers that he was receiving

2

methadone to prevent withdrawals.   After finishing the step-down program on October 19, 2004, Elliott completed a Medical Attention Request complaining that he was again experiencing withdrawals.   The same day the nurse practitioner working at the facility, Jack Charity ("Nurse Practitioner Charity"), noted that Elliott had been off of methadone for two days and was suffering withdrawal symptoms.  Between this time and October 24, 2004, Elliott's condition worsened.

Elliott refused to take his prescribed medication on October 24, 2004.  Later that day, he fell in his dorm and struck his head, and was taken to the Louisiana State University Medical Center ("LSUMC") emergency room for treatment.  A doctor placed eight staples in his head to repair a laceration caused by the fall. Elliott was then transported back to the jail that evening and placed in a holding tank with a video camera so that the jail officers could monitor his condition.  While in the tank, Elliott's condition deteriorated to the point that he was hallucinating, incoherent, and disoriented.

On October 26, 2004, Elliott was again taken to the emergency room at LSUMC, this time because he was experiencing hallucinations.  While at the hospital, he was seen by two doctors and given a psychiatric evaluation.  The

3

doctors chose not to admit Elliott into the inpatient psychiatric facility, but instead changed his medications and released him back to the Bossier Parish Sheriff's Department ("BPSD").

The next day, October 27, 2004, Elliott was again incoherent and hallucinating, and at 12:20 p.m. he was observed crawling on the floor of his cell and running into walls. He was placed in a restraining chair until 7:20 p.m. to prevent him from harming himself.

In the early hours of October 28, 2004, Steve Braidwood ("Braidwood"), a paramedic employed at the penal farm, and Deputy Toloso administered to Elliott his medications. At around 8:00 a.m., Elliott was examined by Nurse Practitioner Charity, who then consulted with Dr. Mazzanti regarding Elliott's condition. Dr. Mazzanti responded by adding Haldol to the medications Elliott was taking. Nurse Practitioner Charity then met with Warden Weaver to discuss having Elliott transferred to a private treatment facility. After the meeting, Warden Weaver began the process to have Elliott transferred to a private facility. Warden Weaver was advised by the Willis-Knighton South treatment facility that Elliott would first have to be released from custody, a process that would require consultation with the

4

district attorney and a judge's approval. Warden Weaver would also have to verify that Elliott had private insurance to pay for such treatment.[1]

Elliott was placed in a restraining chair at 11:45 a.m.  At 4:53 p.m., just after the required judge's approval was obtained, attempts were made to remove Elliott from the chair, dress him, and transport him to a private inpatient drug treatment facility.   During the process, Elliott stopped breathing.   He was taken to the emergency room at Willis-Knighton Hospital in Bossier City where he was pronounced dead.  The autopsy report states that Elliott died of natural causes, with the "immediate cause" being acute myocardial ischemia, and the underlying causes being cirrhosis of the liver with severe fatty changes and chronic drug abuse. Record Document 34, Ex. 8 at page 2.

Throughout Elliott's incarceration, his family made repeated phone calls to the BPSD telling the officers of dangers associated with methadone withdrawal. Elliott's father called on several occasions and personally spoke with Warden Weaver, warning him that if Elliott did not get methadone he would have a heart

---

[1]Even if, as plaintiffs argue, Warden Weaver had been told previously that Elliott had private insurance, it is likely that he still would have to verify such information before Elliott could be transferred.

attack and die.  Elliott's father also claims that he informed Warden Weaver that Elliott had private insurance to cover any costs associated with private treatment, but Warden Weaver denies any recollection of such discussion. Elliott's brother also called the BPSD six times, personally speaking with Warden Weaver five of the times, telling him that if Elliott did not get methadone he would die.  Elliott's sister also called the BPSD on several occasions warning of the dangers associated with not providing Elliott with methadone, and even called the state representative for the area to voice her concerns.  Warden Weaver admits to speaking with several members of the family.

After Elliott's death, the plaintiffs filed the instant suit under 42 U.S.C. § 1983, alleging that the defendants violated Elliott's constitutional rights, including his Eighth Amendment right to be free from cruel and unusual punishment.  The defendants filed this motion for summary judgment, arguing that a constitutional violation has not been established and that the case should therefore be dismissed.

## II.  LAW AND ANALYSIS

**A.    Summary Judgment.**

Summary judgment is proper pursuant to Rule 56 of the Federal Rules of Civil Procedure "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Stahl v. Novartis Pharm. Corp., 283 F.3d 254, 263 (5th Cir. 2002).  If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004)(citations and quotations omitted).  Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary

judgment should be granted.  See Boudreaux v. Swift Transp. Co.,402 F.3d 536,

540 (5th Cir. 2005).

**B.      Inadequate Medical Care.**

The plaintiffs allege that the defendants violated the Eighth Amendment's

prohibition against cruel and unusual punishment by acting with deliberate

indifference to Elliott's medical needs.  "[D]eliberate indifference to serious medical

needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' . . .

proscribed by the Eighth Amendment."  Estelle v. Gamble, 429 U.S. 97, 104, 97

S. Ct. 285, 291 (1976).  A violation of the Eighth Amendment is found if the

plaintiffs prove "objective exposure to a substantial risk of serious harm" and that

"prison officials acted or failed to act with deliberate indifference to that risk."

Gobert v. Caldwell, 463 F.3d 339, 345 (5th Cir. 2006).

"Deliberate indifference is an extremely high standard to meet."  Id. at 346.

See e.g. Norton v. Dimazana, 122 F.3d 286 (5th Cir. 1997) (claim based on

constant but unsuccessful treatment of serious prolapsed rectum condition dismissed

as frivolous); Stewart v. Murphy, 174 F.3d 530 (5th Cir. 1999) (summary judgment

in favor of defendants upheld where medical staff rendered treatment for fatal bed

8

sores but staff had failed to discover condition early, did not follow up on orders, did not follow prior recommendations, and did not read nurses' notes). It encompasses only unnecessary and wanton infliction of pain repugnant to the conscience of mankind. See Farmer v. Brennan, 511 U.S. 825, 839-40, 114 S. Ct. 1970, 1980 (1994). Disagreement with the diagnostic measures or methods of treatment provided by prison officials does not state an Eighth Amendment claim for indifference to medical needs. See Norton, 122 F.3d at 292. Mere negligence in giving or failing to supply medical treatment will not support an action for deliberate indifference. See Stewart, 174 F.3d at 534.

The defendants need only inform the court of the basis for their motion for summary judgment and identify those parts of the record that they believe demonstrate the absence of a genuine issue of material fact. Once that burden is satisfied, the burden then falls upon the plaintiffs to demonstrate the existence of a genuine issue of material fact. See Celotex, 477 U.S. at 322, 106 S. Ct. at 2552.

None of the defendants is employed in the field of medicine. They work as officers and administrators at a correctional facility. When they became aware of the danger of Elliott's situation, they provided him with medical treatment through

9

Nurse Practitioner Charity, sent him to LSUMC to be examined and evaluated by doctors, and then deferred to the medical professionals' opinions as to the appropriate treatment. It was the doctors who dictated the medicines and treatment Elliott received and who sent Elliott back to the jail in spite of the withdrawal symptoms he was experiencing. When Warden Weaver was advised by Nurse Practitioner Charity that Elliott should be sent to a private drug treatment facility, he immediately began the process to have Elliott released, as required by the drug treatment facility before he could be admitted. Warden Weaver contacted the district attorney and obtained an order from a judge to have Elliott released without paying the $350,000 bond. These actions evidenced Warden Weaver's concern for Elliott's medical needs. As soon as Warden Weaver had completed the process (the same day he was advised by Nurse Practitioner Charity that Elliott needed to be admitted to a private treatment facility), preparations began to have Elliott immediately transferred to the facility.

It would be difficult to find that the jail officials were even negligent, as they provided Elliott with professional medical treatment each time he requested medical attention and each time it appeared medical attention was necessary. For example,

the records show that every time Elliott requested medical care by filling out a medical request form, he was seen by jail medical personnel. See Record Document 36, Ex. 2-4, 7 and 11. The records also show that Elliott was given his medicine every day, except for the days he refused to take it. See Record Document 34, Ex. 5, 10 and 12. He was monitored by the facility's medical staff regularly and was continually under the treatment of Dr. Mazzanti. When Nurse Practitioner Charity recommended, on October 26, 2004, that Elliott be taken to an emergency room for the withdrawal symptoms he was experiencing, he was immediately transferred to LSUMC. When a prison official defers to a doctor's or a nurse practitioner's opinion as to how an inmate should be treated for a medical condition, the high standard of deliberate indifference is not established. In short, the plaintiffs have not shown that the defendants at any time deprived Elliott of medical care.

The plaintiffs' most concerning piece of evidence is the fact that no medical professional examined Elliott on October 27, 2004, therefore, a closer examination of the surrounding circumstances is warranted. Elliott's symptoms were severe that day, including hallucinations and incoherence. A review of the record shows that

11

he was sent to the emergency room for similar symptoms the day before, however.[2]

The doctors examined Elliott and he was given a psychiatric evaluation before being

sent back to the jail a few hours later.  After returning to the jail, Elliott was put on

a watch where he was checked every fifteen minutes and was placed in a restraining

chair to prevent him from harming himself.  It was not unreasonable for the

personnel monitoring Elliott to believe that because the doctors did not seem

concerned about the symptoms the day before, but rather sent him back to the jail

with no additional treatment, that the same symptoms a few hours later did not

warrant another trip to the emergency room.  Furthermore, on that same day, Elliott

met with his lawyer and went to court and there is no indication that his condition

was so severe that his lawyer, a person hired to represent his interests, was

concerned about his condition or took any action to obtain additional treatment for

him.  Also, Elliott was seen by the facility's paramedic early the next morning, and

by Nurse Practitioner Charity, who consulted with Dr. Mazzanti, and none of these

trained medical professionals saw a need for immediate emergency action.  This

---

[2]On October 26, 2004, Elliott's documented symptoms included hallucinations,
bizarre behavior, talking to walls, and seeing and hearing things.  See Record
Document 34, Ex. 4 at page 18.

shows that even if Elliott had been examined by a medical professional on October 27, it is unlikely that he would have received any treatment different from what he actually received. Although a different course of action might have been appropriate on October 27, the surrounding facts preclude a finding of deliberate indifference.

The plaintiffs also suggest that Elliott should have been sent to a private treatment facility immediately after his withdrawal symptoms began. However, an assertion that an inmate should have received different medical care does not meet the deliberate indifference standard, even if the evidence later supports such assertion. See Norton, 122 F.3d at 292. This is true even when the person accused of deliberate indifference is a physician and has been extensively trained regarding appropriate medical treatment. See Stewart, 174 F.3d at 534. It would certainly apply here where the defendants are not trained in the field of medicine. The defendants did not exhibit deliberate indifference by failing to reject the physicians' prescribed treatment and instead seek other care for Elliott.

The plaintiffs' next claim that Elliott should have been taken to a hospital emergency room earlier on October 28, 2004, the day he died, and they argue that the fact he was not shows deliberate indifference to his serious medical needs. This

claim lacks merit.  Both a paramedic and a nurse practitioner examined Elliott and evaluated his condition throughout that morning, and the nurse practitioner consulted with Dr. Mazzanti about Elliott's symptoms.  None of these medical professionals, each with extensive medical training and experience, felt that Elliott required emergency care.[3]  Nurse Practitioner Charity even advised the jail personnel to call him the next day and report on Elliott's condition, an order which shows that he did not view Elliott's condition as dire.[4]  The plaintiffs' argument suggests that the proper course of action by the defendants would have been to disregard the medical professionals' determinations and immediately send Elliott to a hospital emergency room.  While in hindsight that may appear to have been the best course of action, the defendants' failure to do so does not show deliberate indifference.  A claim that

---

[3]In addition, none of the four medical doctors who provided opinions for the plaintiffs would state that the symptoms Elliott was exhibiting on the date of his death suggested that emergency attention was required.  See Record Document 41, Ex. 23.

[4]This also demonstrates that Nurse Practitioner Charity viewed his care of Elliott as continual, as opposed to a series of separate examinations, further showing that Elliott was under the continual care of medical personnel.

different medical treatment should have been given does not suffice to establish deliberate indifference. See Norton, 122 F.3d at 292.

Finally, the plaintiffs introduce statements by several inmates who were incarcerated at the Bossier Parish penal farm at the same time as Elliott. These inmates claim to have seen Elliott in the restraining chair and claim that Elliott had been sprayed with mace. They also claim that they heard Braidwood tell a guard to spray Elliott with mace if he caused any more problems. While these accusations are disturbing, even if true, none states that any of the defendants were present when these actions are alleged to have taken place and none shows any evidence that any of the defendants had knowledge of these events.

"In order to state a cause of action under section 1983, the plaintiff must identify defendants who were either personally involved in the constitutional violation or whose acts are causally connected to the constitutional violation alleged." Woods v. Edwards, 51 F.3d 577, 583 (5th Cir. 1995). "Under section 1983, supervisory officials are not liable for the actions of subordinates on any theory of vicarious liability." Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987). The plaintiffs have not presented evidence that any of the defendants

participated in the acts alleged by the inmates or knew they were taking place. Therefore, even if the allegations are true, they do not establish a claim against the defendants for deliberate indifference.

To support a finding of deliberate indifference, a defendant's act must indicate that he subjectively intended for the harm to occur. See Thompson v. Uphsur, 245 F.3d 447, 458-459 (5th Cir. 2001). The plaintiffs' own expert, W. Kenneth Katsaris, admitted that he did not believe that the defendants intended for Elliott to suffer harm:

> Q.   So are you saying he [the defendants] intended the harm to occur?
> A.   I didn't say that. You don't have to intend.
> Q.   Did he -- do you have any evidence that he intended harm?
> A.   No; no. I said that already. It's not intentional...

Record Document 41, Ex. 22 at page 2. Additionally, the plaintiffs have produced no evidence to support such a conclusion, while the defendants have produced ample evidence to show just the opposite: that the defendants were concerned with Elliott's condition and did many things to prevent him from suffering harm. There is no evidence that the defendants' behavior rose to the level of "egregious intentional

16

conduct [as] required to satisfy the exacting deliberate indifference standard."
Gobert, 463 F.3d at 351.

The defendants did not deprive Elliott of medical care, but rather provided
continuous medical treatment.  The plaintiffs have failed to establish an essential
element of a claim for violation of Eight Amendment rights: deliberate indifference.
The fact remains that the staff afforded treatment of a degree that does not permit
a finding of subjective deliberate indifference to Elliott's serious medical needs.

The plaintiffs have not denied that Elliott was treated repeatedly for his
withdrawal symptoms.  They have submitted no evidence that prison personnel ever
refused to treat him, ignored his complaints, intentionally treated him incorrectly,
or engaged in any similar conduct that would clearly evince a wanton disregard for
any serious medical needs.  At most, the plaintiffs claim that the prison's medical
personnel treated Elliott incorrectly.  This is not sufficient to establish a genuine fact
issue as to whether an Eighth Amendment violation occurred.  Furthermore, medical
records of sick calls, examinations, diagnoses, and medications may rebut an
inmate's allegations of deliberate indifference.  See Mendoza v. Lynaugh, 989 F.2d
191, 193-95 (5th Cir. 1993).  The summary judgment record is replete with

17

examples of such records. It is amply clear that the defendants were neither reckless nor deliberately indifferent to Elliott's medical needs. In fact, the record demonstrates quite the opposite. Because this court finds that the plaintiffs have not raised genuine issues as to facts which would adequately support a conclusion of "deliberate indifference to serious medical needs," the claim against the defendants must be dismissed.

## C.    **Remaining Federal Law Claims**.

The remaining claims are against Sheriff Deen for failing to properly train his officers and for promulgating a policy or practice of violating the constitution. See City of Canton, Ohio v. Harris, 489 U.S. 378, 387, 109 S.Ct. 1197, 1204 (1989). However, a failure to train establishes liability "only where the failure to train amounts to deliberate indifference" and "reflects a deliberate or conscious choice" by the defendant. Id. at 388-389; see also Board of County Com'rs of Bryan County, Okl. v. Brown, 520 U.S. 397, 415-416, 117 S.Ct. 1382, 1394 (1997). Plaintiffs have presented no evidence of an unconstitutional custom or policy

promulgated by Sheriff Deen.[5] They have also failed to establish that Sheriff Deen made a deliberate or conscious choice to disregard the constitutional rights of inmates in his custody. Because of the quantity and strength of the evidence found to counter a charge of deliberate indifference, the claims against Sheriff Deen should be dismissed.

**D.   Qualified Immunity.**

The Supreme Court has instructed that the threshold inquiry in a qualified immunity analysis is whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001). If the facts do not support a constitutional violation, then the inquiry ceases there. See id. However, if the injured party is able to demonstrate the violation of a constitutional right, then the court must undertake a two-step analysis: (1) whether the violated right was clearly established and (2) whether the defendant's conduct

---

[5]Plaintiffs have introduced the death of Wayne Quesinberry as evidence of unconstitutional policy. See Record Document 36. However, one other case of a drug withdrawal-related death, alone, is not enough to establish a case for an unconstitutional custom or policy.

was objectively reasonable under existing clearly established law.  See Colston v. Barnhart, 130 F.3d 96, 99 (5th Cir. 1997).  In the instant case, based on the plethora of summary judgment evidence, the court determines that the facts alleged do not support the conclusion that the defendants violated Elliott's constitutional rights. Simply put, the defendants did not violate Elliott's constitutional right to be free from cruel and unusual punishment.  To the contrary, the defendants' actions under the circumstances were objectively reasonable.  Thus, had the defense of qualified immunity been necessary for the defendants, they would have been entitled to its use.

**E.    State Claims.**

The plaintiffs' state law claims parallel their federal law claims.  Because the plaintiffs have failed to establish the evidence necessary for a finding that Elliott's constitutional rights were violated under federal law, they have also failed to establish a claim under state law.  Under state law, the defendants need only choose a reasonable course of action.  See Mathieu v. Imperial Toy Corp., 646 So. 2d 318, 322 (La. 1994).  As discussed above, the defendants actions were reasonable, therefore the state law claims are also dismissed.

20

**F.     Appropriate Plaintiffs**.

The plaintiffs have failed to establish the evidence necessary for a finding that Elliott's constitutional rights were violated.  Therefore, it is unnecessary for this court to decide whether Elliott's parents are appropriate plaintiffs in this action.

### III.  CONCLUSION

Based on the foregoing analysis, the defendants' motion for summary judgment (Record Document 34) is **GRANTED**.

A judgment consistent with the terms of this Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED** at Shreveport, Louisiana, this **29**th day of March, 2007.



JUDGE TOM STAG

21